David INGEBRETSEN, On Behalf of Himself and His Daughter, Anna Ingebretsen; Berlena McCallum, On Behalf of Herself and Her Son, John M. Dozier; The Rev. Dr. Donald Bell, On Behalf of Himself and His Daughter, Kathryn Diana Bell; William D. Lamson, On Behalf of Himself and His Daughter, Leigh Lamson–Quay; Terry Bacola, On Behalf of Herself and Her Sons, Brian Bacola and Darren Bacola; Robert S. McGowan; Jerusha Degroote; John Baker; American Civil Liberties Union of Mississippi, Inc., Plaintiffs,

v.

The JACKSON PUBLIC SCHOOL DISTRICT; Board of Trustees of the Jackson Public School District, By and Through Its President, Mark Bailey; and Mike Moore, In His Official Capacity as The Attorney General of the State of Mississippi, Defendants.

No. 3:94–cv–411WS.

United States District Court,
S.D. Mississippi,
Jackson Division.

Sept. 2, 1994.

Robert B. McDuff, Jackson, MS, Elliot M. Mincberg, Judith E. Schaeffer, People for the American Way, Washington, DC, for plaintiffs.

James A. Keith, J. Perry Sansing, Jackson, MS, T. Hunt Cole, Jr., Miss. Atty. General's Office, Jackson, MS, for defendants.

## MEMORANDUM OPINION AND ORDER

WINGATE, District Judge.

Before the court is the plaintiffs' motion for preliminary injunction which seeks to enjoin the enforcement of Mississippi's school-prayer statute, 1994 Miss.Laws ch. 609, §§ 1 to 3 (codified as amended at Miss.Code Ann. §§ 37–13–4 & 37–13–4.1 (rev. 1990)). This

statute purports to permit public-school students to initiate prayer at various compulsory and noncompulsory school events. The defendants have filed a motion to dismiss or, alternatively, for summary judgment on the grounds, *inter alia,* that this lawsuit does not present a "case" or "controversy" within the meaning of Article III[1] of the United States Constitution, and further that the plaintiffs have not suffered an injury of a character that should invoke the jurisdiction of this court.

The interrogatory here is whether the plaintiffs herein are entitled to injunctive relief under the dictates of *Canal Auth. of State of Fla. v. Callaway,* 489 F.2d 567 (5th Cir.1974), upon plaintiffs' assertion that the school-prayer statute *sub judice* is in conflict with the Establishment Clause[2] of the First Amendment to the United States Constitution and its interpreting cases.

Although this debate is generally framed by concerns of whether prayer in the public schools would complement or boost secular learning and character development, today's ruling makes no reference to these matters. Nor does this case decide whether prayer in the public schools would stem the tide of juvenile unlawfulness and immorality which many claim is on the upsurge. Rather, the focus here is simply on the language of the school-prayer statute and whether it survives the requisites of *Canal Auth. of State of Fla. v. Callaway, supra,* at 572. Earlier, this court in a preliminary ruling immediately determined that at least one aspect of the school-prayer statute appears to offend the

Establishment Clause.[3] Since the statute contains a severability clause, this court then sought to determine whether to enjoin but portions of the statute, or whether to enjoin it in toto. During this subsequent hearing, held on August 16, 1994, the plaintiffs presented live testimony, and both parties introduced documentary exhibits. The court then heard oral arguments on the facts and the law. Sufficiently educated in all of the particulars, this court now renders its ruling.

## I. *PARTIES AND JURISDICTION*

The plaintiffs represent three distinct classes of persons: (1) students currently enrolled in the Jackson, Mississippi, Public Schools; (2) parents of those students, in their capacities as both parents and taxpayers; and (3) the American Civil Liberties Union ("ACLU"), a non-profit membership organization of the State of Mississippi. The ACLU appears as a plaintiff on its own behalf and on behalf of its members and their minor children. The defendants here are: (1) the Jackson, Mississippi, Public School District ("District"); (2) the Board of Trustees of the Jackson Public School District ("School Board"), by and through its president, Mark Bailey; and (3) Mike Moore, in his official capacity as the Attorney General of the State of Mississippi.

This case is properly before this court pursuant to federal question jurisdiction, 28 U.S.C. § 1331,[4] and civil rights jurisdiction, 28 U.S.C. § 1343.[5]

---

1. U.S. Const. art. III, § 2, cl. 1 provides in pertinent part:

 The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States ...

2. U.S. Const. amend. I provides in pertinent part:

 Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof;

 . . . .

3. *See* Memorandum Opinion and Order, Civil Action No. 3:94–cv–411WS (S.D.Miss. Aug. 11, 1994) (Wingate, J.). *See also* section on Invocations and Benedictions in this opinion.

4. 28 U.S.C. § 1331 provides:

 The district courts shall have original jurisdiction of all civil cases arising under the Constitution, laws, or treaties of the United States.

5. 28 U.S.C. § 1343(a)(3) provides:

 (a) The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person: (3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States.

## II. *FACTS* [6] *AND PROCEDURE*

In response to a request by the majority of the student body at Wingfield High School in Jackson, Mississippi, the school's principal, Dr. Bishop Earl Knox, permitted [7] the student body president to deliver a prayer over the school intercom system on the morning of November 9, 1993. The student body had previously voted 490 to 96 to permit such a prayer. Although earlier advised by the District's attorney that such a practice was condemned by the United States Constitution and, thus, by the District's policy, Dr. Knox nevertheless permitted the prayer. Over the next three days the prayers were delivered over the school intercom system to all students who, during which, were required to remain at their desks.

On November 11, 1993, Dr. Knox was summoned to meet with his immediate supervisor, Deputy Superintendent John Sanders, and was placed on administrative leave for allowing the students to offer the morning prayers. On November 24, 1993, the District's Superintendent, Dr. Benjamin Canada, terminated Dr. Knox's employment.

Dr. Knox subsequently contested his termination and requested an evidentiary hearing.[8] In due course, Dr. Knox appeared before Hearing Officer Dr. Dan Merritt, whose task was to determine whether Dr. Knox's actions, taken in spite of the disapproval of the District's attorney,[9] constituted insubordination—a ground for dismissal under Miss.Code Ann. § 37–9–59.[10] The Hearing Officer found on the evidence presented that Dr. Knox's actions had been insubordinate.

On December 15, 1993, instead of ratifying either the termination or the aforementioned ground for such, the School Board voted to suspend Dr. Knox's employment until July 1, 1994, on the grounds that he had shown "lack of professional judgment." Still aggrieved, Dr. Knox appealed that suspension to the Chancery Court of the First Judicial District of Hinds County. By order dated April 22, 1994, Chancellor W.O. "Chet" Dillard ordered the School Board to reinstate Dr. Knox with back pay.[11]

**6.** The facts are derived primarily from stipulations by the parties and exhibits received into evidence during the supplemental preliminary injunction hearing. *See Order*, No. 3:94–cv–411WS (S.D.Miss. Sept. 2, 1994) (Wingate, J.).

**7.** When Dr. Knox first received the students' request or became aware of the support for such, he requested an opinion from the Jackson Public School District Attorney, JoAnne Nelson, as to whether his students could begin each day with the announcement of a nonsectarian, nonproselytizing prayer over the intercom if the student body voted on such a practice and the prayer was led by a student volunteer. By memorandum to Dr. Knox dated November 10, 1993, Ms. Nelson concluded that this practice was not permitted by the United States Constitution and, thus, was prohibited by the Jackson Public School District Policy. *See* Pls.Ex. 16.

**8.** Pursuant to Miss.Code Ann. § 37–9–59 (1972), before a principal or teacher may be suspended or removed, he/she must be informed that he/she is entitled to a public hearing. Under § 37–9–111(2) (1972), the principal or teacher shall be allowed to "present matters at the hearing relevant to the reasons given for the nonreemployment determination and to the reasons the employee alleges to be the reasons for nonreemployment and to be represented by counsel at such a hearing."

**9.** Apparently, the District's attorney was relying upon the cases of *School District of Abington*

*Township v. Schempp*, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963); *Meltzer v. Bd. of Public Instruction of Orange Cty.*, 577 F.2d 311 (5th Cir.1978) (en banc), *cert. denied*, 439 U.S. 1089, 99 S.Ct. 872, 59 L.Ed.2d 56 (1979); and *Hall v. Board of School Com'rs of Conecuh County*, 656 F.2d 999 (5th Cir.1981), which all have held that morning devotionals delivered over the school's public address system are unconstitutional.

**10.** Section 37–9–59 of the Miss.Code Ann. sets forth various grounds, to wit: "incompetence, neglect of duty, immoral conduct, intemperance, brutal treatment of a pupil, or other good cause" for suspending or removing principals or teachers, as well as the procedures to be followed before principals or teachers may be suspended or removed.

**11.** The School Board filed a notice of appeal from the Chancery Court's judgment on April 22, 1994. Then, the School Board filed a Motion for Stay Upon Appeal with the Chancery Court. The motion was denied by order dated April 26, 1994. Pursuant to Miss.Sup.Ct.R. 8, on April 26, 1994, the School Board filed a Motion to Stay Execution with the Mississippi Supreme Court. The School Board asked the Supreme Court to stay the Chancery Court's directives concerning Dr. Knox's reinstatement, back pay and costs, and the Chancery Court's guidelines concerning prayer. The Mississippi Supreme Court granted

Dr. Knox's suspension sparked considerable public debate throughout the State of Mississippi as to the proper role of prayer in the public schools. When Dr. Knox was placed on administrative leave, 299 students were suspended from public schools in Jackson and surrounding areas for walking out of classrooms in protest of Dr. Knox's treatment. Several rallies were held in support of Dr. Knox and school prayer. One of the largest such rallies was held in Jackson on the steps of the state capitol and featured a supportive speech by the Governor of Mississippi, Kirk Fordice.

This public support for Dr. Knox even reached into the Mississippi Legislature. On March 24, 1994, the Mississippi Senate passed a resolution commending Dr. Knox "for his forthright action [which] has been the catalyst for a renewed effort all over this state and nation to return prayer to our public schools: ..." S.Con.Res. 663, 1994 Reg.Sess. Then, on March 29, 1994, the Mississippi House of Representatives passed House Bill No. 222, the subject school-prayer law, by a vote of 109 to 11. The next day House Bill No. 222 was approved by the Mississippi Senate by a vote of 31–18.

On April 7, 1994, Governor Fordice signed into law House Bill No. 222, which became effective on July 1, 1994. The entire text of the statute is reproduced in the appendix of this opinion. However, the language at the center of this controversy is § 1(2) of the school-prayer statute which states that:

> [o]n public school property, other public property or other property, invocations, benedictions or nonsectarian, nonproselytizing student-initiated voluntary prayer shall be permitted during compulsory or noncompulsory school-related student assemblies, student sporting events, graduation or commencement ceremonies and other school-related student events.

1994 Miss.Laws ch. 609, § 1(2). The drafters of the statute included the following preamble:

> [t]he exercise of the rights guaranteed under subsection (2) of this section shall not be construed to indicate any support, approval or sanction of the contents of any such prayer, invocation, benediction or other activity, or be construed as an unconstitutional use of any public property or other property by the State of Mississippi or any agency, department, board, commission, institution or other instrumentality thereof or any political subdivision of the state, including any county or municipality and any instrumentality thereof. The exercise of these rights on public school property, other public property or other property for such school-related activities, by students and others, shall not be construed as the promotion or establishment of any religion or religious belief.

*Id.* § 1(4).

Further, the school-prayer statute contains a severability clause which permits any provision of the statute found to be invalid or unconstitutional to be severed without affecting the remainder of the statute. *See id.* § 1(5).

On August 4, 1994, this court held a hearing on plaintiffs' motion for a preliminary injunction which asked this court to enjoin the defendants from implementing in any manner the school-prayer statute. At that time, the court also heard the motion of the American Family Association Law Center ("AFALC") to intervene on behalf of certain students enrolled in Mississippi public schools. The court decided to hold the motion for intervention in abeyance, but permitted AFALC to present argument at the hearing as amicus curiae. AFALC was instructed to re-urge its motion after the court ruled on the motion for preliminary injunction.

---

the School Board's Motion to Stay Execution Pending Appeal on the issues of back pay, costs, and the prayer guidelines. As to the issue of reinstatement, the Mississippi Supreme Court found that Bishop Knox should be allowed to return to work on July 1, 1994, because the School Board had failed to satisfy the requirements of the Miss.R.Civ.P. 62 which required the School Board to: (a) make a strong showing that

it is likely to succeed on the merits of the appeal; (b) establish that unless a stay is granted the District will suffer irreparable injury; (c) show that no substantial harm will come to other interested parties; and (d) establish that a stay would do no harm to the public interest. *See Board of Trustees of the Jackson Pub. Sch. Dist. v. Knox,* 638 So.2d 1278 (Miss.1994) (en banc).

On August 11, 1994, one day before the start of the 1994–1995 academic year for the Mississippi public schools, this court issued a preliminary injunction which enjoined the enforcement of the school-prayer statute. The injunction was designed to maintain the status quo until the court had full opportunity to assess the severability approach.

On August 16, 1994, the court held a supplemental hearing to determine what portion of the statute, if any, could escape the injunction by its severability clause. The court also listened to the testimony of Dr. Dan Merritt, Interim Superintendent of the District, and Dr. Emanuel Reeves, principal of Provine High School in Jackson, Mississippi. Both witnesses shared their experiences with respect to the issue of prayer in the District, as well as their perspectives on potential logistical and problematical aspects of the statute's implementation. At the second hearing, the court also permitted AFALC to re-urge its motion for intervention.

## III. PRELIMINARY MATTERS

### A. Motion to Dismiss.

The Attorney General has submitted his motion under Rules 12(b)(1), 12(b)(6),[12] and 56(b) and (c),[13] Federal Rules of Civil Procedure, to dismiss this lawsuit on the following seven proffered grounds: (1) that the court should abstain from construing the statute and, instead, should await the conclusion of state court litigation which might supply a construction; (2) that the instant complaint seeks redress of hypothetical and speculative injuries and, thus, fails to present a case or controversy as required under Article III;[14]

(3) that the action challenged by the plaintiffs constitutes private action, not state action, therefore, the driving jurisdictional cause-of-action base, 42 U.S.C. § 1983, is not implicated; (4) that the plaintiffs have not met their burden of demonstrating that the school-prayer statute is unconstitutional on its face; (5) that existing Fifth Circuit authority amply demonstrates the facial constitutionality of the statute; (6) that the injunctive relief sought by the plaintiffs would chill the exercise of religious free speech; and (7) in the alternative, that the severance of any invalid portion of the statute would make the remainder of the statute facially constitutional. The court will address in turn these arguments under the prescribed juridical standards which govern courts in their assessment of Rules 12 and 56 motions.

In ruling on a motion to dismiss for lack of subject matter jurisdiction and failure to state a claim under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, the court must accept as true the facts alleged in the complaint or pleadings, together with all reasonable inferences therefrom, to determine whether the allegations state any basis for legal relief. *See Benton v. U.S.*, 960 F.2d 19 (5th Cir.1992); *see also Fernandez–Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir.1993); *General Guaranty Ins. Co. v. Parkerson*, 369 F.2d 821 (5th Cir.1966); *Richardson v. Southwest Miss. Reg. Med. Ctr.*, 794 F.Supp. 198, 199 (S.D.Miss.1992) (Wingate, J.). The court is obliged to draw all reasonable inferences in favor of the non-moving party before granting a motion to dismiss for failure to state a

**12. Rule 12. Defenses and Objections—When and How Presented—By Pleading or Motion—Motion for Judgment on the Pleadings**

**(b) How Presented.** Every defense, in law or fact, to a claim for relief in any pleading, rather a claim, counterclaim, cross-claim, or third party claim, shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion: (1) lack of jurisdiction over the subject matter; ... (6) failure to state a claim upon which relief can be granted.

**13.** Rule 56(b) of the Federal Rules of Civil Procedure provides:

(b) For Defending Party. A party against whom a claim, counterclaim or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof.

Rule 56(c) of the Federal Rules of Civil Procedure provides that the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

**14.** *See, supra,* ftn. 1.

claim. *See Fernandez–Montes*, 987 F.2d at 284.

■ A moving party under Rule 56 of the Federal Rules of Civil Procedure is entitled to summary judgment if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In response to the motion, the adverse party must show that there exists a dispute over issues of fact which must be resolved at trial. If the adverse party does not make such a showing, the moving party is entitled to summary judgment. Fed. R.Civ.P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The evidence offered in opposition to the motion is to be believed, and all reasonable inferences are to be drawn in favor of the adverse party. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513.

### 1. Duty to Give Constitutional Construction and Abstention

■ The Attorney General has correctly observed that this court has a duty, where possible, to avoid a construction which invalidates a statute. *See United States v. Security Indust. Bank*, 459 U.S. 70, 78, 103 S.Ct. 407, 412, 74 L.Ed.2d 235 (1982); *Califano v. Yamasaki*, 442 U.S. 682, 693, 99 S.Ct. 2545, 2553, 61 L.Ed.2d 176 (1979); *Crowell v. Benson*, 285 U.S. 22, 62, 52 S.Ct. 285, 296, 76 L.Ed. 598 (1932). This canon of statutory construction does not require, however, that the court press a particular construction to the point of disingenuous evasion or to the point of rewriting the statute. *See Chapman v. United States*, 500 U.S. 453, 464, 111 S.Ct. 1919, 1927, 114 L.Ed.2d 524 (1991); *United States v. Locke*, 471 U.S. 84, 96, 105 S.Ct. 1785, 1793, 85 L.Ed.2d 64 (1985). As will be seen in § IV of this opinion, this court has striven to follow this canon of statutory construction, which upon application, simply does not favor the defendants.

■ Furthermore, the mere fact that this statute contains terms which are unclear or susceptible to multiple interpretations does not persuade this court to abstain from adjudicating this dispute. *See Procunier v. Martinez*, 416 U.S. 396, 401 n. 5, 94 S.Ct. 1800, 1805 n. 5, 40 L.Ed.2d 224 (1974) (holding that not every vagueness challenge to an uninterpreted state statute constitutes a proper case for abstention). The Attorney General argues the appropriateness of a *Pullman*-type abstention here on the grounds that there is currently pending in state court a lawsuit which might address the construction of the school-prayer statute and construe any vague, unclear terms.

The abstention doctrine embodied in *Railroad Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), simply does not apply here. *Pullman*-type abstention "does not, of course, involve the abdication of federal jurisdiction, but only the postponement of its exercise." *Harrison v. NAACP*, 360 U.S. 167, 175, 79 S.Ct. 1025, 1030, 3 L.Ed.2d 1152 (1959); *see also Allen v. McCurry*, 449 U.S. 90, 101 n. 17, 101 S.Ct. 411, 418 n. 17, 66 L.Ed.2d 308 (1980). It applies where there is the existence of an " 'uncertain issue of state law, 'the resolution of which may eliminate or materially alter the federal constitutional question.' " *Martinez*, 416 U.S. at 402–03, 94 S.Ct. at 1806 (quoting *Harman v. Forssenius*, 380 U.S. 528, 534, 85 S.Ct. 1177, 1181, 14 L.Ed.2d 50 (1965)). First, we are not faced with such a situation here. We do not have here "an uncertain issue of state law." Secondly, the only pending state case remotely pertinent to the one at bar is the District's pending appeal before the Mississippi Supreme Court challenging the Chancellor's finding that "lack of professional judgment" does not constitute "good cause," so as to warrant Knox's firing. *See Knox*, 638 So.2d 1278. The gravamen of that lawsuit does not concern the dispute here over the constitutionality of the school-prayer statute. Defendants' abstention argument is both misplaced and unsupported.

### 2. Lack of "Case or Controversy" and Standing

■ In order to confer Article III jurisdiction, the plaintiffs must make an allegation of

present or immediate injury in fact, where the parties requesting standing have "alleged such personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens presentation of issues." *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962); *Massachusetts v. Mellon,* 262 U.S. 447, 488, 43 S.Ct. 597, 601, 67 L.Ed. 1078 (1923). In *Meltzer v. Bd. of Public Instruction of Orange Cty.,* 548 F.2d 559 (5th Cir.1977), the Fifth Circuit struggled to craft a workable definition for "case or controversy" and had this to say of the sometimes ineffable term:

> The Declaratory Judgment Act's limitation to "cases of actual controversy" has regard to the constitutional provision in Article III and is operative only in respect to controversies which are such in the constitutional sense, the word "actual" being one of emphasis rather than of definition. *See, e.g., Aetna Life Insurance Co. v. Haworth,* 1937, 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617, *reh. denied,* 300 U.S. 687, 57 S.Ct. 667, 81 L.Ed 889. Thus, there can be no case or controversy where parties seek adjudication of only a political question, or merely seek an advisory opinion, or where the litigation presents merely an abstract, academic or hypothetical question, or where the question sought to be adjudicated has been mooted by subsequent developments, or where the plaintiff has no standing to maintain the action.

> In *Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 1941, 312 U.S. 270, 61 S.Ct. 510, 85 L.Ed. 826, the Supreme Court emphasized that the difference between an abstract question and a "controversy" contemplated by 28 U.S.C.A. § 2201 is necessarily one of degree. Faced with the difficulty of fashioning a precise test for determining whether there is such a controversy in a particular case, the Court substantially avoided the problem by using an essentially circular test: "The question in

each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* at 273, 61 S.Ct. at 512.

> In *Steffel v. Thompson* [415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974) ], *supra,* the Supreme Court discussed and applied the case or controversy aspects of the Declaratory Judgment Act in its criminal setting. The Court there pointed out that there were two stages to the case or controversy inquiry. The first is whether the appellant's allegations are "imaginary or speculative" or whether they are, on the contrary, real and substantial.

*Meltzer v. Bd. of Public Instruction of Orange Cty.,* 548 F.2d at 569–70.

Contrary to defendants' argument, this court finds that the plaintiffs herein have alleged real and substantial injury which may result from the implementation of the school-prayer statute so as to confer Article III jurisdiction. It is not necessary that the plaintiffs await actual enforcement of the school-prayer statute before they may seek judicial relief. *See, e.g., Karen B. v. Treen,* 653 F.2d 897, 902 (5th Cir. Unit A 1981).[15] The fact that the statute has not yet been enforced does not render the plaintiffs' alleged injuries conjectural or premature for adjudication. The testimony of Dr. Merritt and Dr. Reeves that they constantly have been besieged by student requests to have public, classroom prayer and that they reasonably expect many students to act under the school-prayer statute at issue here amply demonstrates that the risk of injury is neither remote nor speculative. Tr. of Aug. 16, 1994, Hr'g at 23–26 (Dr. Merritt); Tr. of Aug. 16, 1994, Hr'g at 39–44 (Dr. Reeves). The huge demonstrations and concomitant public outcry for the return of prayer to the public schools in the aftermath of the Dr. Knox controversy likewise demonstrate that

---

**15.** In *Karen B. v. Treen,* 653 F.2d at 902, upon addressing the involved Louisiana statute and its derivative Jefferson Parish School Board regulations which established guidelines for student participation in prayer at school, the Fifth Circuit stated:

The Jefferson Parish program has yet to be put into effect. Thus, the nature and extent of state involvement in religious activity is in some measure speculative at this time. What is certain is that the statute itself makes inappropriate governmental involvement in religious affairs inevitable.

the interest in public school prayer is real and will translate into action under the statute. Accordingly, this court holds that the issues in this case are sufficiently concrete and sharp so as to present an Article III case.

■ Although the issues of whether this is an Article III case and whether the plaintiffs have standing are technically separate issues, the plaintiffs' satisfaction of their Article III burden adequately supports their standing to bring this action. *See School Dist. of Abington Township v. Schempp,* 374 U.S. 203, 224 n. 9, 83 S.Ct. 1560, 1572 n. 9, 10 L.Ed.2d 844 (1963) ("But the requirements for standing to challenge state action under the Establishment Clause, unlike those relating to the Free Exercise Clause, do not include proof that particular religious freedoms are infringed. The parties here are school children and their parents who are directly affected by the laws and practices against which their complaints are directed." (citations omitted)); *Karen B.,* 653 F.2d at 902.

### 3. Lack of State Action

■ The Attorney General argues that the plaintiffs have failed to state a claim under 42 U.S.C. § 1983 [16] because no state action is present in this case. Rather, says the Attorney General, plaintiffs' real complaint is against the private actions of third parties who may attempt to exercise their rights under the school-prayer statute.

Such a characterization misstates the gravamen of the plaintiffs' complaint. *See Blum v. Yaretsky,* 457 U.S. 991, 1003, 102 S.Ct. 2777, 2785, 73 L.Ed.2d 534 (1982) ("[f]aithful adherence to the 'state action' requirement ... requires careful attention to the gravamen of the plaintiffs' complaint"). What is complained of here is a legislative enactment which potentially empowers third parties, at their whim, to offer prayers, with or without student body agreement, at all school events and assemblies, whether noncompulsory or compulsory. If this empowerment in all other respects oversteps the bounds of the Establishment Clause, the state may not escape liability under 42 U.S.C. § 1983 by claiming that the school-prayer statute merely authorizes private parties to take these actions.

### 4. Facial Challenge to the Statute

■ The Attorney General takes the position that the plaintiffs have not met their heavy burden of establishing that the challenged statute could be valid "under no set of circumstances." *See United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987). This principle has been applied in various areas such as facial attacks on the Bail Reform Act, *see id.;* and abortion laws, *see, e.g., Barnes v. Moore,* 970 F.2d 12, 14 (5th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 656, 121 L.Ed.2d 582 (1992). However, the rigid dictates of *Salerno* do not apply in Establishment Clause cases. The United States Supreme Court has stated that facial challenges to laws impacting the Establishment Clause are best analyzed under the *Lemon* test.

This said, we turn to consider whether the District Court was correct in concluding that the AFLA [the Adolescent Family Life Act] was unconstitutional on its face. As in previous cases involving facial challenges on Establishment Clause grounds, *e.g., Edwards v. Aguillard* [482 U.S. 578, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987)] *supra; Mueller v. Allen,* 463 U.S. 388, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983), we assess the constitutionality of an enactment by reference to the three factors first articulated in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). *Bowen v. Kendrick,* 487 U.S. 589, 601–02, 108 S.Ct. 2562, 2569, 101 L.Ed.2d 520 (1988). The Supreme Court has consistently failed to draw distinctions between a facial attack and an "as applied" attack on statutes in the Establishment Clause arena. *Id.* at 600–02, 108 S.Ct. at 2569–70.

---

**16.** Title 42 U.S.C. § 1983 provides in pertinent part as follows:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any state or territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

### 5. Prior Restraint

■ Relying on the cases of *Board of Educ. of Westside Community Sch. v. Mergens*, 496 U.S. 226, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990), *Lamb's Chapel v. Center Moriches Sch. Dist.*, —— U.S. ——, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993), and *Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), the Attorney General contends that the injunctive relief sought by the plaintiffs would result in an impermissible prior restraint on the protected First Amendment rights of students. The Attorney General's argument is neither persuasive nor novel. This argument was addressed and rejected in both *Lee v. Weisman*, 505 U.S. ——, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992), and *Doe v. Duncanville Independent School Dist.*, 994 F.2d 160 (5th Cir.1993). In *Doe*, the Fifth Circuit stated:

> The DISD's [Duncanville Independent School District] assertion of its employees' First Amendment rights of speech, association, and free exercise, and its attempt to portray its refusal to interfere with their spontaneous religious expression as a necessary accommodation of religion, while understandable, cannot withstand analysis. Acceptance of DISD's argument would produce an unwieldy result foreclosed by precedent; in *Lee*, the Court affirmed that "[t]he principle that government may accommodate the free exercise of religion does not supersede the fundamental limitations imposed by the Establishment Clause." 505 U.S. at ——, 112 S.Ct. at 2655.

Moreover, as acknowledged by the Attorney General, the students' rights of Free Speech and Free Exercise are pre-existing and, as such, the granting of an injunction would have no bearing on the students' ability to freely exercise their pre-existing rights. An injunction here would not prevent students from praying silently alone or assembling together to pray before or after school. In fact, Dr. Reeves testified that Provine High School, across town from Wingfield High, presently allows a student prayer group to meet on the school grounds for the purpose of having morning prayers.

### 6. Eleventh Amendment Immunity

■ During argument held on August 16, 1994, the Attorney General hinted for the first time that the Eleventh Amendment may bar the relief sought here. This argument was not raised in the motion to dismiss and is, therefore, not properly before the court. Nonetheless, the court is not persuaded by the argument. Injunctive relief of the character sought here is not barred by Eleventh Amendment. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102, 104 S.Ct. 900, 909, 79 L.Ed.2d 67 (1984); *Edelman v. Jordan*, 415 U.S. 651, 666–67, 94 S.Ct. 1347, 1357–58, 39 L.Ed.2d 662 (1974); *Ex parte Young*, 209 U.S. 123, 155–61, 28 S.Ct. 441, 452–54, 52 L.Ed. 714 (1908).

### B. Motion to Intervene

To date, AFALC has been permitted to participate in these proceedings as amicus curiae. After the court granted its preliminary injunction of August 11, 1994, the court revisited AFALC's motion to intervene as a party defendant. During that hearing on August 16, 1994, AFALC argued that it was entitled to intervention of right or, in the alternative, to permissive intervention. *See* Fed.R.Civ.P. 24(a) & (b).

■ A proposed intervenor shall be permitted of right to intervene in an action: (1) when a statute confers an unconditional right to intervene; (2) when the proposed intervenor claims an interest relating to the property or transaction which is the subject of the litigation; (3) when the proposed intervenor is so situated that the disposition of the action, as a practical matter, may impair or impede its ability to protect that interest; and (4) when the proposed intervenor's interest is inadequately represented by the parties to the lawsuit. Fed.R.Civ.P. 24(a); *Kneeland v. National Collegiate Athletic Ass'n*, 806 F.2d 1285, 1287 (5th Cir.1987); *Bush v. Viterna*, 740 F.2d 350, 354 (5th Cir. 1984) (citing cases); *see also* 7C Charles A. Wright *et al.*, Federal Practice and Procedure §§ 1906–1909 (1986 & Supp.1994).

■ This court finds that AFALC's interest is adequately represented here by the

Attorney General's office which, by statute,[17] is charged with defending the school-prayer law on behalf of all of the citizens of the State. The prerequisite prong of "inadequate representation" being absent, this court is obliged to deny AFALC's motion for intervention of right.

As an alternative basis for intervention, AFALC seeks permissive intervention and correctly observes that it is within the discretion of the court to grant permissive intervention when: (1) the application is timely made; (2) the proposed intervenor's claim or defense and the main action have a common question of law or fact; and (3) intervention will not unduly delay or prejudice the adjudication of the rights of the original parties. Fed.R.Civ.P. 24(b); *League of United Latin Am. Citizens v. Clements*, 884 F.2d 185, 189 n. 2 (5th Cir.1989); *Bush*, 740 F.2d at 358–59; *see also* Charles A. Wright *et al., supra*, §§ 1910–1913.

Permitting AFALC to intervene in this matter would serve no purpose other than delay. AFALC's efforts would but duplicate those of counsel for the Attorney General's Office. The Court in *Bush* voiced sentiments on a permissive intervention question before it which certainly embraces the situation here.

> It is easy enough to see what are the arguments against intervention, where, as here, the intervenor merely underlines issues of law already raised by the primary parties. Additional parties always take additional time. Even if they have no witnesses or their own, they are the sources of additional questions, briefs, arguments, motions and the like which tend to make the proceedings a Donnybrook Fair. Where he presents no new questions, a third party can contribute usually most effectively and always most expeditiously

by a brief amicus curiae and not by intervention.

*Bush*, 740 F.2d at 359, quoting *Crosby Steam Gage & Valve Co. v. Manning, Maxwell & Moore, Inc.*, 51 F.Supp. 972, 973 (D.Mass. 1943).

Consequently, the court denies AFALC's motion for permissive intervention. AFALC will be allowed to continue as amicus.

## IV. STANDARDS FOR INJUNCTIVE RELIEF AND REVIEW UNDER THE ESTABLISHMENT CLAUSE

In order to obtain a preliminary injunction, the plaintiffs here have the burden of proving four factors: a substantial likelihood of success on the merits; a substantial threat that they will suffer irreparable injury if the injunction is not granted; that the threatened injury to the plaintiffs outweighs the threatened harm the injunction may do to the defendants; and that granting the preliminary injunction will not disserve the public interest. *Callaway*, 489 F.2d at 572; *Doe*, 994 F.2d at 163.

As stated earlier, where possible the court has a duty to construe a statute in a way that upholds its constitutionality. This means, in passing on the constitutionality of a statute, the court must separate the valid part from the invalid part. *Griffin v. Breckenridge*, 403 U.S. 88, 104, 91 S.Ct. 1790, 1799, 29 L.Ed.2d 338 (1971). The presence of a severance clause may assist the court in that function. *See, e.g., EEOC v. Hernando Bank, Inc.*, 724 F.2d 1188, 1190 (5th Cir. 1984). Accordingly, this court must now take measure of the various provisions of the school-prayer statute to determine, under the applicable standards articulated by the United States Supreme Court, whether any, all or only parts of the statute should be enjoined.

17. Title 28 U.S.C. § 2403 provides as follows:
**2403. Intervention by United States or a State; constitutional question.**
(b) In any action, suit, or proceeding in a court of the United States to which a State or any agency, officer, or employee thereof is not a party, wherein the constitutionality of any statute of that State affecting the public interest is drawn in question, the court shall certify such fact to the attorney general of the State,

and shall permit the State to intervene for presentation of evidence, if evidence is otherwise admissible in the case, and for argument on the question of constitutionality. The State shall, subject to the applicable provisions of law, have all the rights of a party and be subject to all liabilities of a party as to the court costs to the extent necessary for a proper presentation of the facts and law relating to the question of constitutionality.

There has been some debate between the parties as to which standard this court should employ to assess the validity of the subject statute. A brief review of the tests applied by the United States Supreme Court reveals five. The tripartite test [18] set forth in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), until recently has been the prevailing test to determine whether a challenged activity violates the Establishment Clause. The United States Supreme Court also has employed the endorsement test [19] of *County of Allegheny v. ACLU,* 492 U.S. 573, 595 & n. 46, 109 S.Ct. 3086, 3102 & n. 46, 106 L.Ed.2d 472 (1989). And recently in *Weisman,* 505 U.S. at ——, 112 S.Ct. at 2655, the United States Supreme Court employed the so-called "coercion" test.[20] In *Jones v. Clear Creek Indep. Sch. Dist. ("Jones II"),* 977 F.2d 963 (5th Cir. 1992), the Fifth Circuit applied all five tests. This court does not quarrel with this approach, but need not here make an exhausting analysis under each of the tests because the defects hereinafter discussed are apparent under any of the tests.

### V. *ANALYSIS OF THE STATUTE*

The school prayer statute at issue here is a comprehensive, broad-sweeping legislative enactment which purports to embrace within its span school prayer at virtually all school events and upon all public property. The statute fails to define "prayer." Nonetheless, the court recognizes that "prayer is perhaps the quintessential religious practice for many of the world's faiths, and it plays a significant role in the devotional lives of most religious people." *Karen B. v. Treen,* 653 F.2d at 901. The school events mentioned by the statute are "assemblies," "sporting events," "graduation or commencement ceremonies," and "other school-related student events." No where does the statute define any of these terms. Hence, a reader of the statute is left uninformed as to the meanings of "assemblies" and whether such also includes groups in classroom instruction; nor is the meaning of "other school-related student events" clarified.

The statute is clear, however, in its thrust to extend prayer for these undefined school-related activities well beyond the schoolhouse doors to "public school property," other "public property," and "other property." This extension of prayer rights for school-related activities beyond the school house doors plainly serves to heighten the concern for the missing definitions of "assemblies" and "other school-related student events."

Unlike the regulations in *Jones II* and *Weisman,* which were directed at high school seniors, and that in *Hall v. Board of Sch. Com'rs of Conecuh County,* 656 F.2d 999 (5th Cir. Unit A 1981), which was aimed at high school students, the statute here is directed at grades, kindergarten through twelve. This statute authorizes elementary, (grades k–5), middle, (grades 6–8), and high school (grades 9–12) students to offer nonsectarian and nonproselytizing prayer at compulsory and noncompulsory school-related events. The statute presumably expects the state school districts to exact regulations for the implementation of school prayer because the statute is silent as to any procedures. Questions such as how students are to be selected to offer prayers; who will review the prayers to ensure the nonsectarian and nonproselytizing nature of such; the duration of any prayer; and the timing of the prayers are left unanswered by the statute. But, these questions are particularly worrisome and im-

---

**18.** Under the *Lemon* test, the challenged conduct must: (1) have a predominantly secular purpose; (2) have a primary effect that neither advances, endorses nor inhibits religion; and (3) not result in excessive entanglement of government and religion. *Id.* at 612–13, 91 S.Ct. at 2111. In *Jones v. Clear Creek Indep. Sch. Dist. (Jones II),* 977 F.2d 963 (5th Cir.1992), the Court counted the *Lemon* test as three separate tests, which explains the reference to five tests in this opinion and the *Jones II* opinion. *See Jones II,* 977 F.2d at 966.

**19.** "We understand government to unconstitutionally endorse religion when a reasonable person would view the challenged government action as a disapproval her contrary religious choices." *Jones II,* 977 F.2d at 968, citing *Weisman,* 505 U.S. at ——, 112 S.Ct. at 2665 n. 9.

**20.** *Weisman* identifies unconstitutional coercion when (1) government directs, (2) a former religious exercise, (3) in such a way as to oblige the participation of objectors. 500 U.S. at ——, 112 S.Ct. at 2655.

mediate where school prayer rights have been given not only to high school students, but to elementary students as well.

Students are not the only ones who are authorized to deliver prayers under the statute. The statute guarantees the right of prayer on public school property at school-related activities to students and *others* (emphasis added). The statute permits this, even though settled case law forbids teachers and nonstudents from leading prayers at the schools. *See Weisman*, 505 U.S. at ——, 112 S.Ct. at 2657; *Engel v. Vitale*, 370 U.S. 421, 425, 82 S.Ct. 1261, 1264, 8 L.Ed.2d 601 (1962).

Missing from the statute is any "opt out" provision which would permit students who are opposed to prayer to leave the room or refuse to participate. The *Weisman* Court viewed as "coercive" the fact that the only alternative for a student opposed to prayer at high school commencement was to absent herself from the ceremonies. 505 U.S. at ——, 112 S.Ct. at 2661. *See also Engel*, 370 U.S. at 428, 82 S.Ct. at 1267; *Schempp*, 374 U.S. at 224–25, 83 S.Ct. at 1573. Since the instant statute purports to extend school prayer to compulsory events, the statute appears unsympathetic to the plight of those unwilling to participate.

The above observations have not gone unnoticed by the school educators, Dr. Merritt and Dr. Reeves, who testified during the hearing on this matter. Both educators testified that the statute as written would disrupt instructional and educational activities throughout the District. Unless answers to the questions above raised are supplied, these eminent educators reasonably apprehend that the effect of this far-sweeping statute would cause disharmony, confusion, and upset. This result would be ironic and unfortunate, since the authors and supporters of the school-prayer law fervently hope to achieve just the opposite. Clearly, this statute has problems. And, clearly, several of its parts offend the Establishment Clause. Those particular aspects will be addressed below.

## A. *Invocations and Benedictions*

As the statute now reads: "invocations, benedictions *or* nonsectarian, nonproselytizing student-initiated voluntary prayer shall be permitted...." 1994 Miss.Laws ch. 609 § 1(2) (emphasis added). The statute does not specify who may deliver invocations and benedictions during compulsory or noncompulsory school-related student assemblies, student sporting events, graduation or commencement ceremonies and other school-related student events. If the statute read that nonsectarian, non-proselytizing student-initiated voluntary invocations and benedictions shall be permitted, one would know who is authorized to deliver such. As it now reads, any person, including school administrators, teachers, or members of the clergy, seemingly would be permitted under the statute to deliver invocations and benedictions at a wide range of school-related functions. This interpretation is supported by the statute's concern with: "[t]he exercise of these rights [1994 Miss.Laws ch. 609, § 1(2) ] on public school property, other public property or other property for such school-related activities, by students and *others* . . . ." *Id.* § 1(4) (emphasis added).

Of course, settled case law clearly establishes that clergy, school officials and teachers may not lead students in prayer. *See, e.g., Weisman*, 505 U.S. ——, 112 S.Ct. 2649 (holding that inviting clergy to offer invocation and benediction prayers at high school graduation violates Establishment Clause); *Schempp*, 374 U.S. 203, 83 S.Ct. 1560 (invalidating the recital of the Lord's Prayer in public school classrooms); *Doe*, 994 F.2d 160 (upholding a preliminary injunction enjoining the school district's practice of permitting the coach of the basketball team to sponsor prayers at the end of games and practices); *Karen B.*, 653 F.2d 897 (invalidating school board guidelines which permitted student and teacher prayers in classrooms); *Hall*, 656 F.2d 999 (invalidating practice of conducting morning devotional readings over the school's public address system).

Additionally, even student-initiated nonsectarian and nonproselytizing invocations and benedictions may run afoul of the "endorsement" test. *See Jager v. Douglas County*

*Sch. Dist.*, 862 F.2d 824, 831–32 (11th Cir. 1989) ("When religious invocation is given via a sound system controlled by school principals and the religious invocation occurs at a school-sponsored event at a school or facility, the conclusion is inescapable that the religious invocation conveys a message that the school endorses the religious invocation.... Furthermore, to persons of any age who do not believe in prayer, religious invocations permitted by the equal access plan convey the message that the state endorses religions believing in prayer and denigrates those religions that do not. If these prayers are delivered by authority figures, such as teachers, as is possible under the equal access plan, the message endorsing prayer becomes even stronger.").

### B. Nonsectarian, Nonproselytizing Student–Initiated Voluntary Prayer

 Permitting nonsectarian, nonproselytizing student-initiated voluntary prayer was found to be permissible by the Fifth Circuit in *Jones II.* However, that decision only addressed the propriety of invocations and benedictions at high school commencement ceremonies. Therefore, the court is bound to hold that nonsectarian, nonproselytizing student-initiated voluntary prayers are permissible at high school commencement ceremonies. Whether this type of prayer is permissible in other contexts, such as compulsory or noncompulsory assemblies or student sporting events, for instance, is an entirely different matter.

### C. Compulsory or Noncompulsory School–Related Student Assemblies

Dr. Merritt and Dr. Reeves testified that a variety of student assemblies are held at schools throughout the District. Among the named programs were pep rallies, honor roll recognition assemblies, beauty pageants, athletics honors and awards, orientations, drug education programs, standardized testing, dramas, talent shows, musicals, band concerts, Parent Teacher Association, and Boy Scouts. Their testimony revealed that the majority of these programs are held during instructional hours. Teachers usually establish the agendas of these programs and over-

see their implementation. Neither Dr. Merritt nor Dr. Reeves stated whether attendance at assemblies is compulsory. *See* Tr. of Aug. 16, 1994, Hr'g at 5–9 (Dr. Merritt); Tr. of Aug. 16, 1994, Hr'g at 37–39 (Dr. Reeves).

The court finds that permitting nonsectarian, nonproselytizing student-initiated voluntary prayer at compulsory student assemblies may violate the tenets of *Weisman.* 505 U.S. at ——, 112 S.Ct. at 2661. If students are subjected to prayer in a "captive audience" situation, the state, although not officially delivering the prayer, may be effectively coercing students who do not wish to hear or participate in a prayer to do so. Even a rule that would permit students to absent themselves from an assembly they find offensive, even a noncompulsory one, would not cure the Establishment Clause problem. *See Weisman; Schempp*, 374 U.S. at 226, 83 S.Ct. at 1573 (daily Bible reading and class recitation of prayer violates First Amendment notwithstanding that students could be excused); *Engel*, 370 U.S. at 430, 82 S.Ct. at 1266 ("neither the fact that the prayer may be denominationally neutral nor the fact that its observance on the part of students is voluntary can serve to free it from the limitations of the Establishment Clause.")

The court further finds that permitting students to offer nonsectarian, nonproselytizing student-initiated voluntary prayer at noncompulsory school-related student assemblies may also violate the tenets of *Lemon.* The Attorney General has stated that student prayer at noncompulsory student events serves, in small part, to solemnize an assembly, to prevent viewpoint discrimination, and to accommodate the free exercise of religion. None of these proffered reasons is persuasive.

First, unlike high school graduation, there is nothing so momentous or singularly important about noncompulsory student assemblies that necessitates the need for solemnization. The Attorney General has not shown that these assemblies are steeped in centuries of tradition. *Cf. Marsh v. Chambers.* Neither has the Attorney General shown that nonsectarian, nonproselytizing student prayer is needed to combat viewpoint discrimination or to accommodate religious expression. These

rights exist independently of the school-prayer statute.

Second, the "principal" or "primary" effect of permitting student-initiated voluntary prayer at noncompulsory school related student assemblies appears to advance religion. "Our nation's elementary and secondary schools play a unique role in transmitting basic and fundamental values to our youth. To an impressionable student, even the mere appearance of secular involvement in religious activities might indicate that the state has placed its imprimatur on a particular religious creed. This symbolic inference is too dangerous to permit." *Brandon v. Board of Ed. of Guilderland Cent. Sch.*, 635 F.2d 971, 978 (2nd Cir.1980); *Roemer v. The Board of Public Works*, 426 U.S. 736, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976). *See also Collins v. Chandler Unified Sch. Dist.*, 644 F.2d 759, 761 (9th Cir.1981) ("moreover, these cases support no meaningful distinction between school authorities actually organizing religious activity and officials merely 'permitting' students to direct the exercises").

The court has one final concern about student assemblies. It is not unreasonable to assume that attendance at assemblies is compulsory, since the majority of the assemblies take place during instructional hours. In instances where assemblies for drug programs, testing, orientation are held, for instance, these assemblies serve an instructional and educational function. Indeed, these assemblies are nothing more than extensions of the classrooms. It stands to reason that if students are prohibited from praying in the classrooms, allowing them to do so in assemblies of an instructional nature likewise fails all three prongs of the *Lemon* test. *See Williams v. Vermont*, 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985) (striking down statute which permitted daily moment of silence expressly for prayer); *Karen B.*, 653 F.2d at 902 (striking down statute authorizing voluntary student-initiated prayer or teacher-initiated prayer at the start of school day).

### D. Student Sporting Events

The court finds that permitting nonsectarian, nonproselytizing, student-initiated voluntary prayer at student sporting events may violate the first prong of the *Lemon* test. In order to hurdle the first prong of the *Lemon* test, the Attorney General must demonstrate that the challenged action has a predominantly secular purpose. The Attorney General has stated that student prayer at student sporting events serves, in small part, to solemnize the sporting events; to prevent viewpoint discrimination; and to accommodate the free exercise of religion. None of these proffered reasons is persuasive.

The *Jones II* Court acknowledged that solemnization serves the legitimate secular purpose of ceremonial prayer. 977 F.2d at 966–97. The dignity and singular importance of the event in question is certainly a factor to consider when selecting a public event for which prayer may be appropriate. *See Weisman*, 505 U.S. at ——— ———, 112 S.Ct. at 2659–60. The offering of prayer to solemnize any and all student sporting events seems, at a minimum, to inflate the singular momentousness of each sporting event held over the course of a lengthy season. The range of sporting events in the District include football, basketball, baseball, softball, volleyball, golf, soccer, and tennis. The testimony of Dr. Merritt indicates that during an average week a high school may have more than one sporting event per day. And on the middle school level, Dr. Merritt stated that there is some activity going on at least once a week in every middle school. It is difficult to see how permitting prayers at these types of sporting events falls within the embrace of *Weisman* or *Jones II.* Despite the Attorney General's attempts to prove otherwise, the court simply is not convinced that prayer at a sporting event serves a secular purpose. *See also Karen B.*, 653 F.2d at 901 ("The unmistakable message of the Supreme Court's teachings is that the state cannot employ a religious means to serve otherwise legitimate secular interests."); *Jager*, 862 F.2d at 829–30 (rejecting secular purpose of prayer at high school football games); *Doe v. Aldine Indep. Sch. Dist.*, 563 F.Supp. 883 (S.D.Tex. 1982) (same).

Further, the fact that the prayers are nonsectarian, nonproselytizing, and voluntarily

delivered by students does not remove the taint of government sponsorship of religion. *See Engel,* 370 U.S. at 430, 82 S.Ct. at 1266–67 ("Neither the fact that the prayer may be denominationally neutral nor the fact that its observance on the part of the students is voluntary can serve to free it from the limitations of the Establishment Clause"); *Karen B.,* 653 F.2d at 902.

Also troubling is that by permitting prayer at student sporting events, it appears that the government is endorsing prayer. As stated above, a statute or regulation which has the effect of endorsing religion does not pass constitutional muster. *See Jager,* 862 F.2d at 831.

■ The Attorney General's second proffered secular purpose of prayer at student sporting events—prohibiting viewpoint discrimination—must be rejected out of hand. While the United States Supreme Court has recognized that prohibiting viewpoint discrimination may serve a secular purpose, *see Mergens,* 496 U.S. at 248, 110 S.Ct. at 2370, the Attorney General has not shown that any of the forums where student prayer is authorized under the statute are open forums and that religious groups have been denied access. The *Mergens* line of cases cited by the Attorney General involves situations where religious groups sought access to public school facilities and were denied for fear that access to these facilities by religious groups would violate the Establishment Clause. The Supreme Court has consistently held that when the state denies to religious groups the same access it provides to other groups, the state has engaged in viewpoint discrimination. *See, e.g., Lamb's Chapel; Mergens.* We are not faced with such a situation here. Student assemblies, student sporting events, graduation or commencement, and other school-related activities ostensibly are not open forums in public schools. By granting prayer an exalted status over other types of speech in these forums, the state runs the grave risk of favoring one religion over another or favoring religion over irreligion. *See Board of Educ. of Kiryas Joel v. Grumet,* — U.S. —, —, 114 S.Ct. 2481, 2491, 129 L.Ed.2d 546 (1994).

### E. Graduation or Commencement Ceremonies

■ As stated in § V.B of this opinion, student prayer at high school commencement ceremonies is certainly appropriate; it is constitutional vel non. What is not certain is whether student prayer at graduation from the lower grades (kindergarten to elementary; elementary to middle school; and middle school to high school) is appropriate. Dr. Merritt gave testimony that the District has no Board-sanctioned or District-sanctioned graduation exercise other than the conferring of a diploma upon graduation from high school. Tr. of Aug. 16, 1994, Hr'g at 13 (Dr. Merritt). He did acknowledge, however, that some schools in the District hold ceremonies to commemorate passage from elementary to middle school and middle school to high school. Since the school-prayer statute at issue applies with equal force to all grades of the public schools, the court must consider the appropriateness of student prayer at these less ceremonious graduations.

There is nothing in the language of *Jones II* to suggest that the court meant for commencement to encompass any ceremony other than the ceremony signifying completion of high school. And, this court is not persuaded that commencement should be interpreted to include graduation ceremonies for lower grades. Particularly compelling here is the fact that students in lower grades "are often susceptible to pressure from their peers toward conformity, and that the influence is strongest in matters of social convention." *Weisman,* 505 U.S. at —, 112 S.Ct. at 2659. Coercion of this nature, no matter how subtle or pronounced, is potentially at odds with the Establishment Clause. *Id.,* 505 U.S. at — – —, 112 S.Ct. at 2658–61. Accordingly, the court believes that the term "graduation" as used in the statute is overbroad inasmuch as the statute seemingly permits more than the Fifth Circuit authorized in *Jones II.*

### F. Other School–Related Student Events

The statute does not specify what the terms "other school-related student events"

encompass. This term could refer to the classroom, school field trips or the prom. Without further guidance from the legislature or the interpretive case law, this term is virtually meaningless. It offers no bounds as to what is encompassed by the law.

## VI. FINDINGS ON INJUNCTION FACTORS

### A. Substantial Likelihood of Success

Based on the foregoing, the court believes that plaintiffs have demonstrated a substantial likelihood that they would prevail on the merits of this case.

### B. A Substantial Threat of Irreparable Injury

■ The court believes that plaintiffs have adequately demonstrated that they will suffer irreparable injury if the school-prayer statute is not enjoined. *See Doe,* 994 F.2d at 167. When First Amendment freedoms are lost, even if for minimal periods of time, irreparable injury has occurred. *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976).

### C. The Threatened Injury to Plaintiffs Outweighs the Threatened Harm the Injunction May Do to Defendants

■ The District does not argue that it will be harmed if the school-prayer statute is enjoined. The Attorney General, however, contends that the issuance of an injunction would have a chilling effect on students' First Amendment rights. The court is not persuaded by that contention. As stated above, the granting of an injunction would have no bearing on the students' ability to freely exercise their existing rights of free speech and free exercise. Consequently, the court finds that the threatened injury to the plaintiffs outweighs any harm the injunction would do to the defendants. *See Doe,* 994 F.2d at 167.

### D. Public Interest

The court finds that the public interest will not be disserved by the issuance of an injunction aimed at preventing the enforcement of a potentially unconstitutional statute. *See Doe,* 994 F.2d at 166.

## VII. CONCLUSION

Our nation's elementary and secondary schools are at the center of our democratic society; they play a unique role in transmitting fundamental education and basic values to our youth. Over the years, pursuant to the dictates of the Establishment Clause of the First Amendment to the United States Constitution, the federal courts have been zealous in ensuring that these educational laboratories of learning and development are maintained in an atmosphere of religious neutrality. The jurisprudence of the United States Supreme Court and that of the Fifth Circuit clearly attest to this point, as over the years this emphasis on religious neutrality in the nation's public schools has resulted in a number of decisions holding unconstitutional various attempts to introduce prayer in the public schools. *See Weisman,* 505 U.S. ——, 112 S.Ct. 2649 (holding that inviting clergy to offer invocation and benediction prayers at high school graduation violates Establishment Clause); *Jaffree,* 472 U.S. 38, 105 S.Ct. 2479 (holding unconstitutional statute authorizing a daily period of silence in public schools for meditation or voluntary prayer); *Schempp,* 374 U.S. 203, 83 S.Ct. 1560 (invalidating daily reading of Bible verses and Lord's Prayer in the public schools); *Engel,* 370 U.S. 421, 82 S.Ct. 1261 (holding unconstitutional recitation of "denominationally neutral" prayer); *Stone v. Graham,* 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980) (holding unconstitutional the posting copy of Ten Commandments on public school walls); *Doe,* 994 F.2d 160 (invalidating district's practice of permitting coach of extracurricular junior high basketball team to sponsor prayers at the end of games and at practices); *Jones II,* 977 F.2d 963 (holding constitutional student-initiated non-sectarian, nonproselytizing prayer at commencement); *Hall,* 656 F.2d 999 (holding unconstitutional high school's practice of permitting students to conduct morning devotional readings over the school's public address system and teaching an elective Bible literature course that consisted entirely of Christian perspective and

within that a fundamentalist and/or evangelical doctrine); *Lubbock Civil Liberties Union v. Lubbock Independent Sch. Dist.*, 669 F.2d 1038 (5th Cir.1982) (holding unconstitutional morning Bible reading over school public address system, classroom prayers led by teachers, a period of silent prayer ended by "Amen" over public address system and distribution of "Gideon" Bibles to fifth and sixth grade students); *Karen B.*, 653 F.2d 897 (invalidating statute authorizing voluntary student-initiated prayer at the start of the school day); *Meltzer*, 577 F.2d 311 (holding unconstitutional resolution requiring daily Bible reading and prayer in public schools).

The statute at issue here is the most far-reaching one this court has encountered in its research. The aim of Mississippi's school-prayer statute is to permit prayer at virtually any and all school-related activities. Presently, this court cannot find support for this comprehensive approach either in the Establishment Clause itself, or in that body of cases which have given interpretation to the Clause.

Accordingly, this court holds to its earlier pronouncement that the enforcement of this statute should be enjoined, except with one modification. In part, the court has held that the portion of the statute that permits nonsectarian, nonproselytizing student-initiated voluntary prayer at high school commencements (not graduation from lower grades) has the blessings of the Fifth Circuit pursuant to its holding in *Jones II*. The ACLU agrees.[21] Hence, that portion of the school-prayer statute which permits prayers at commencement ceremonies will not be enjoined so long as any such circumstances comport with the spirit and dictates of *Jones II*. In all other respects, this court hereby enjoins the enforcement of the Mississippi School–Prayer Statute, 1994 Miss.Laws ch. 609, §§ 1 to 3 (codified as amended at Miss. Code Ann. §§ 37–13–4 & 37–13–4.1 (rev. 1990)).

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that the school-prayer statute shall be enjoined in all parts, except as to

nonsectarian, nonproselytizing student-initiated voluntary prayer at high school commencement, as condoned by *Jones II*.

**SO ORDERED AND ADJUDGED.**

APPENDIX

MISSISSIPPI 1994 SESSION LAWS

1994 REGULAR SESSION

Additions and deletions are not identified in this document. Vetoed provisions within tabular material are not displayed.

Chapter No. 609

H.B. No. 222

SCHOOL PRAYER—STUDENT–
INITIATED—VOLUNTARY

AN ACT TO PERMIT NONSECTARIAN, NONPROSELYTIZING, STUDENT–INITIATED VOLUNTARY PRAYER ON PUBLIC SCHOOL PROPERTY, OTHER PUBLIC PROPERTY OR OTHER PROPERTY AT SCHOOL–RELATED ACTIVITIES, INCLUDING STUDENT SPORTING EVENTS, GRADUATION OR COMMENCEMENT CEREMONIES AND OTHER STUDENT ASSEMBLIES AND EVENTS; TO AMEND SECTION 37–13–4, MISSISSIPPI CODE OF 1972, IN CONFORMITY WITH THE PROVISIONS OF THIS ACT; AND FOR RELATED PURPOSES.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF MISSISSIPPI:

SECTION 1. The following shall be codified as Section 37–13–4.1, Mississippi Code of 1972:

37–13–4.1. (1) The legislative intent and purpose for this section is to protect the freedom of speech guaranteed by the First Amendment to the United States Constitution, to define for the citizens of Mississippi the rights and privileges that are accorded them on public school property, other public property or other property at school-related events; and to provide guidance to public

---

21. Plaintiffs' Memorandum of Points and Authorities in Opposition to the Attorney General's Motion to Dismiss or for Summary Judgment and in

Further Support of Plaintiffs' Motion for a Preliminary Injunction, p. 24.

school officials on the rights and requirements of law that they must apply. The intent and purpose of the Legislature is to accommodate the free exercise of religious rights of its student citizens in the public schools and at public school events as provided to them by the First Amendment to the United States Constitution and the judicial interpretations thereof as given by the United States Supreme Court.

(2) On public school property, other public property or other property, invocations, benedictions or nonsectarian, nonproselytizing student-initiated voluntary prayer shall be permitted during compulsory or noncompulsory school-related student assemblies, student sporting events, graduation or commencement ceremonies and other school-related student events.

(3) This section shall not diminish the right of any student or person to exercise his rights of free speech and religion, including prayer, as permitted by the United States Constitution, on public school property, other public property or other property, at times or events other than those stated in subsection (2) of this section.

(4) The exercise of the rights guaranteed under subsection (2) of this section shall not be construed to indicate any support, approval or sanction of the contents of any such prayer, invocation, benediction or other activity, or be construed as an unconstitutional use of any public property or other property by the State of Mississippi or any agency, department, board, commission, institution or other instrumentality thereof or any political subdivision of the state, including any county or municipality and any instrumentality thereof. The exercise of these rights on public school property, other public property or on other property for school-related activities, by students or others, shall not be construed as the promotion or establishment of any religion or religious belief.

(5) The provisions of this section are severable. If any part of this section is declared invalid or unconstitutional, that declaration shall not affect the part or parts that remain.

SECTION 2. Section 37–13–4, Mississippi Code of 1972, is amended as follows:

37–13–4. It shall be lawful for any teacher or school administrator in any of the schools of the state which are supported, in whole or in part, by the public funds of the state, to permit the voluntary participation by students or others in prayer. Nothing contained in this section shall authorize any teacher or other school authority to prescribe the form or content of any prayer. The provisions of this section shall not be construed to amend or repeal the provisions of Section 37–13–4.1 but shall be considered as supplemental and in addition to the provisions of Section 37–13–4.1.

SECTION 3. This act shall take effect and be in force from and after July 1, 1994.

Approved April 7, 1994.